```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ITAY KESHET,
                                                            Case No.
                    Plaintiff,                              20-CV-2604(WFK)(RLM)

       - against -

THE CITY OF NEW YORK, CAPTAIN ACACIA ADAMS,                 **SECOND AMENDED**
CORRECTION OFFICER KEMUEL BENITEZ,                          **COMPLAINT AND**
CAPTAIN HERTHA CAMPBELL,                                    **JURY DEMAND**
CORRECTION OFFICER AKEEM COLLYMORE,
CAPTAIN TIFFANY DUNSON-CHANDLER,
CORRECTION OFFICER PEDRO FRESNEDA,
CORRECTION OFFICER MARK GIULIANO,
CORRECTION OFFICER KELVIN MA,
CORRECTION OFFICER D. H. MARTINEZ,
CORRECTION OFFICER FRANK MILLER,
CAPTAIN RACHEL MORGAN,
CORRECTION OFFICER ANTHONY PAPPALARDO,
CORRECTION OFFICER MARC POLLOCK,
CORRECTION OFFICER TODD RIVERO
and JOHN DOES #1-#10,

                    Defendants.
------------------------------------------------------------------------X
```

Plaintiff ITAY KESHET, by his counsel, THE LAW OFFICES OF LOWELL J. SIDNEY, as and for his Second Amended Complaint alleges as follows.

## INTRODUCTION

1.  This is a civil rights action in which the plaintiff, Itay Keshet ("Plaintiff" or "Keshet"), seeks relief for the violation of his rights secured by, *inter alia*, 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

2.  The claims arise from incidents on or about March 14, 2019, in which officers of the New York City Police Department ("NYPD") and personnel of the New York City Department of Correction ("DOC"), acting under color of state law, intentionally and willfully

subjected Plaintiff to excessive force and battery.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as this Court deems just and proper.

## **VENUE AND JURISDICTION**

4. This action is brought pursuant to 28 U.S.C. § 1331, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments of the United States Constitution.

5. The amount in controversy exceeds $75,000, excluding interest and costs.

6. Venue is laid within the United States District Court for the Eastern District of New York in that defendant City of New York ("City") is located within, and a substantial part of the events giving rise to the claims occurred within, the boundaries of the Eastern District of New York.

## **PARTIES**

7. Plaintiff Itay Keshet is an individual, and is now and at all times mentioned in this complaint a legal resident of Kings County, and State of New York.

8. The City is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, the City, acting through the NYPD and the DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD and DOC matters, respectively, and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD and DOC personnel. In addition, at all times here relevant, defendant City was responsible for enforcing the rules of the NYPD and the DOC, and for ensuring that NYPD and DOC personnel obey the laws of the United States and the State of New York.

9. Captain Acacia Adams was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Captain Acacia Adams harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Adams is sued in her individual capacity.

10. Correction Officer Kemuel Benitez was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Kemuel Benitez harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Benitez is sued in his individual capacity.

11. Captain Hertha Campbell was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Captain Hertha Campbell harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Campbell is sued in her individual capacity.

12. Correction Officer Akeem Collymore was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Akeem Collymore harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Collymore is sued in his individual capacity.

13. Captain Tiffany Dunson-Chandler was, at all times, a corrections officer

employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Captain Tiffany Dunson-Chandler harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Dunson-Chandler is sued in her individual capacity.

14. Correction Officer Pedro Fresneda was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Pedro Fresneda harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Fresneda is sued in his individual capacity.

15. Correction Officer Mark Giuliano was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Mark Giuliano harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Giuliano is sued in his individual capacity.

16. Correction Officer Kelvin Ma was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Kelvin Ma harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Ma is sued in his individual capacity.

17. Correction Officer D. H. Martinez was, at all times herein, a corrections officer

employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer D.H. Martinez harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Martinez is sued in his individual capacity.

18. Correction Officer Frank Miller was, at all times herein, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Frank Miller harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Miller is sued in his individual capacity.

19. Captain Rachel Morgan was, at all times, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Captain Rachel Morgan harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Morgan is sued in her individual capacity.

20. Correction Officer Anthony Pappalardo was, at all times herein, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Anthony Pappalardo harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Pappalardo is sued in his individual capacity.

21. Correction Officer Marc Pollock was, at all times herein, a corrections officer

employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Marc Pollock harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Pollock is sued in his individual capacity.

22. Correction Officer Todd Rivero was, at all times herein, a corrections officer employed by the DOC and as such was acting in the capacity as an agent, servant and/or employee of the DOC. Upon information and belief, at all times relevant hereto, Correction Officer Todd Rivero harassed and otherwise emotionally, mentally and physically harmed Plaintiff and/or failed to intervene to stop such harm. Defendant Rivero is sued in his individual capacity.

23. John Does #1-10, inclusive, are individuals whose names currently are unknown to Plaintiff, are employees of the NYPD and/or DOC, and are sued in their individual capacities. John Does #1-10 and the individually named defendants are collectively referred to as the "Individual Defendants."

24. At all times here mentioned, the Individual Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

**FACTUAL ALLEGATIONS**

25. Plaintiff is a medical doctor, licensed in the States of New York, Ohio, Wisconsin, Iowa, Minnesota, Montana and California.

26. On March 12, 2019, Plaintiff resided with an individual named William Dane in an apartment in a building known as and located at 71 Scholes Street, County of Kings, State of

6

New York.

27. At approximately 3:02 p.m. that day, United States Postal Inspector Michelle Purnavel and two male individuals came to Plaintiff's residence and Inspector Purnavel requested that Plaintiff sign for two (2) packages that she was holding and attempting to deliver to him at the open door to his apartment.

28. As Plaintiff touched one of the packages, which were still being held by Inspector Purnavel, he was immediately arrested and numerous other law-enforcement personnel appeared and entered his dwelling. These individuals were later identified as members of Homeland Security Investigations ("HSI").

29. A search by the members of HSI of the residence was immediately conducted, and although Plaintiff asked to see a Search Warrant, his request was refused. In less than half an hour, the search was terminated and Plaintiff was arrested and transported by HSI to the NYPD's 90th Precinct, where his custody was transferred to the NYPD and DOC.

30. Plaintiff was held at the police precinct, and after several hours, was transferred to the Central Booking area.

31. Upon information and belief, Keshet was then transferred to the Anna M. Kross Correctional Facility on Riker's Island (the "Facility"), even though he should have never been transferred to the Facility.

32. While in the custody of the Individual Defendants at the Facility, Plaintiff was restrained with plastic zip-ties and was insulted, intimidated, harassed, threatened, pepper sprayed, beaten and surrounded by the Individual Defendants

33. As a result of the use of excessive force, Plaintiff sustained a right arm injury.

34. After restraining Keshet, one or more of the Individual Defendants forcibly lifted

Plaintiff from the ground and carried him to an unknown location while he was in extreme pain due to the right arm injury they had caused.

35. Plaintiff was told he was being taken to the showers, and was placed, fully clothed and still bound by zip ties, into a metal cubicle in which he could not turn around.

36. The shower water was turned on by the Individual Defendants, and the water temperature grew from cold, to warm, to hot, to scalding.

37. His pleas and screams elicited nothing but laughter from the Individual Defendants, who were outside the cubicle.

38. The Individual Defendants left Keshet in the scalding shower.

39. Eventually, Plaintiff passed out.

40. When Plaintiff regained consciousness, he found himself on the floor of the shower, at which time scalding water was still falling upon him from the showerhead.

41. This scalding shower caused Plaintiff to suffer first-degree burns upon his neck, chest, shoulder and abdomen. The Individual Defendants refused to allow him to see a doctor or go to a hospital as they termed his injuries "insignificant". Instead, they took Plaintiff to their "clinic".

42. Keshet's medical records from March 14, 2019, fully confirm that he was burned by the scalding temperature of the water from the shower that he was put into by the Individual Defendants:

| Code | Name | Added On | Modified On | Modified By |
|---|---|---|---|---|
| T21.12XA | Burn of first degree of abdominal wall, initial encounter | 03/14/2019 | 03/14/2019 | Ihenacho, Gloria |
| T21.11XA | Burn of first degree of chest wall, initial encounter | 03/14/2019 | 03/14/2019 | Hai, Ruth |

| T20.17XA | Burn of first degree of neck, initial encounter | 03/14/2019 | 03/14/2019 | Hai, Ruth |
|---|---|---|---|---|
| T22.151A | Burn of first degree of right shoulder, initial encounter | 03/14/2019 | 03/14/2019 | Hai, Ruth |

43. After being assessed by a physician who clearly did not believe that Plaintiff himself was a physician, but then used a computer to research his credentials, the doctor could not avoid the fact that there was clear evidence that Keshet had been scalded over his head, neck, back, stomach, chest, arms, and parts of his upper legs.

44. Plaintiff was given a single 5-325 Percocet and was told that he was not going to be released, but that now it was time to go to jail.

45. Plaintiff then was moved to Riker's Island and placed in protective custody, and he was treated the following day by City Health + Hospitals medical personnel. In total, upon information and belief, Keshet spent eight days in custody.

46. On his final day in jail, Plaintiff was loaded onto a bus en-route to court and was handcuffed to another inmate. The handcuffs were extremely painful as his arms were significantly bruised and his right arm in particular was severely hurt from being lifted before having been thrown in the shower.

47. As the bus bounced, Plaintiff had to make physical adjustments to keep the cuffs from grinding into his injuries, which angered the man to which he was handcuffed, which resulted in a series of beatings by that man that were administered each time Keshet flinched.

48. These beatings took place in full view of one or more Individual Defendants, who were on the bus, but who did nothing to stop the attacks.

49. The Individual Defendants failed to intervene in the obviously illegal actions of their fellow officers and personnel as described against Plaintiff.

50. Keshet was held in court for the balance of the day. He was not permitted to speak with a lawyer, a judge, or anyone who would explain what was going on. It was not until the end of the day that a DOC officer came to the cell in which he was being held and said, "you're being released."

51. Within 20 minutes he was released, left standing outside in downtown Manhattan, wearing khaki scrubs, and shoes with no laces, during a cold snap in March, in the evening, completely disoriented. Plaintiff walked from the courthouse to his apartment in Williamsburg.

52. During all of the events above described, the Individual Defendants acted maliciously and with intent to injure Plaintiff.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**(AGAINST ALL INDIVIDUAL DEFENDANTS)**

53. The preceding paragraphs are hereby incorporated by reference.

54. The Individual Defendants through the conduct described above, deprived Plaintiff of his civil, Constitutional and statutory rights under color of law, and are liable to Plaintiff under 42 USC § 1983.

55. The Individual Defendants' conduct deprived Plaintiff of his right to be free from the use of excessive force, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. The Individual Defendants' conduct also deprived Plaintiff of his right to due process of law, pursuant to the Fourteenth Amendment of the United States Constitution.

56. The Individual Defendants used excessive force upon Plaintiff.

57. The conduct of the Individual Defendants was the proximate cause of the serious injuries sustained by Plaintiff.

## SECOND CAUSE OF ACTION
## 42 U.S.C. § 1983 – FAILURE TO INTERVENE
## (AGAINST ALL INDIVIDUAL DEFENDANTS)

58. The preceding paragraphs are hereby incorporated by reference.

59. Despite the excessive force and Constitutional violations being imposed upon Plaintiff by one or more of the Individual Defendants, other Individual Defendants who were also at the scene and witnessed the violative conduct did not intervene to stop the violative conduct.

60. These Individual Defendants neglected their affirmative duty to intercede on behalf of a citizen whose Constitutional rights were being violated.

61. At the time, the Individual Defendants were acting under color of law.

62. The Individual Defendants' actions deprived Plaintiff of his Constitutional rights.

63. The conduct of the Individual Defendants was the proximate cause of the serious injuries sustained by Plaintiff.

## THIRD CAUSE OF ACTION
## MUNICPAL LIABILITY
## (AGAINST THE CITY)

64. The preceding paragraphs are hereby incorporated by reference.

65. The City of New York is liable for the damages suffered by Plaintiff as a result of the conduct of its employees, agents and servants, in that, after learning of their employees' violation of Plaintiff's Constitutional rights, it failed to remedy the wrong; in that it has created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and in that it has been grossly negligent in managing subordinates who caused the unlawful condition or events.

66. The City has been alerted to the regular use of excessive force by its police

officers and excessive force by its correction officers, but has nevertheless exhibited deliberate indifference to such excessive force; that deliberate indifference caused the violation of Plaintiff's Constitutional rights in this case.

67. The aforesaid events were not isolated instances. The City has been aware for some time, from lawsuits, notices of claim, complaints filed with the Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of its police and corrections officers use excessive force and fail to intervene in and report the obviously illegal actions of their fellow officers. Nevertheless, the City has allowed policies and practices that permit the aforementioned conduct to persist.

68. In fact, as part of the Consent Judgment in the matter <u>Nunez v. City of New York</u>, 11-cv-5845(LTS) (S.D.N.Y.), an independent court-appointed Monitor created reports detailing with specificity the use of excessive force at DOC facilities, including the Facility where excessive force was used upon Keshet (i.e. the Anna M. Kross Correctional Facility on Riker's Island).

69. The report covering the first six months of 2019, which is the exact time period at issue in this action (the "Report"), found that the DOC continues to struggle with the use of excessive force and that the excessive force used during the time period had "reached the highest levels since the Consent Judgment went into effect." Report at 3.

70. The Report details how DOC officers' (referred to as Staff) "approach to a situation creates or exacerbates the need to use force." The Report found that Staff dehumanize inmates and that there is a failure "at virtually all levels to actively, directly, and consistently enforce the provisions of the Use of Force Directive." Report at 3-4.

71. Page 9 of the Report notes the failure of Facility leadership "to be able to

discriminate between permissible, necessary force and unnecessary or excessive force."

72. Pages 11 through 14 of the Report reference the poor supervision at the facilities, a lack of consensus as to the proper use of force and how "these failures perpetuate the toxic culture of the Facilities."

73. Pages 19 through 33 of the Report set forth the disturbing increasing trend of unreasonable use of force at the facilities. As stated in the Report at 19, "In fact, for the past 12 months, new high-water marks continued to be set."

74. A chart on page 24 of the Report shows that in the Facility where Keshet was locked in a scalding shower (referred to in the Report as "AMKC") that the average use of force increased from 2.42 in 2016; to 2.72 in 2017; to 3.32 in 2018; and to 3.9 in the first half of 2019.

75. As the Report summarized on page 24, "Over time, the situation at the various Facilities has steadily worsened."

76. The Report highlights that the use of force problem was actually far worse in early 2019 than at the time that the Consent Judgment was entered into, even though the Consent Judgment was supposed to reduce the problem. Report on page 32 (noting that the use of force rate "has continued to rise in each Facility and for each segment of the population, far beyond the serious conditions that gave rise to the Consent Judgment in the first place.").

77. Finally, page 94 of the Report references that as of the date of the Report there was still "limited and sorely inadequate training space" even though money was supposed to be allocated for this. Report at 94.

78. Despite clear notice of the use of excessive force at the Facility, the City has failed to take corrective action. This failure and these policies caused the officers involved in this matter to violate Plaintiff's civil rights, without fear of reprisal.

79. Plaintiff has been damaged as a result of the deliberate indifference of the City to the Constitutional rights of the City's inhabitants.

80. The City is liable for the damages suffered by Plaintiff as a result of the conduct of its employees, agents, and servants, in that, after learning of its employees' violation of Plaintiff's Constitutional rights, it failed to remedy the wrong; it has created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue and it has been grossly negligent in managing subordinates who caused the unlawful condition or event.

81. The City has been alerted to the regular use of excessive force by its police and corrections officers, but has nevertheless exhibited deliberate indifference to such excessive force; that deliberate indifference caused the violation of Plaintiff's Constitutional rights in this matter.

## **JURY DEMAND**

82. Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

A. In favor of Plaintiff in an amount to be determined by a jury for each of Plaintiff's causes of action;

B. Awarding Plaintiff punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiff reasonable attorneys' fees, costs and disbursements of this action pursuant to 42 U.S.C. § 1988; and,

D. Granting such other and further relief as this Court deems just and proper.

So Affirmed on October 25, 2021
Mew York, New York

                                                                                     The Law Office of Lowell J. Sidney

By:    LOWELL J. SIDNEY
       *Attorney(s) for Plaintiff*
       244 5th Avenue – Suite #Q278
       New York, New York 10001
       (888) 222-0513